We have three argued cases this morning. The first of these is No. 14-1188, GPX International Tire Corporation v. United States. Mr. Dirling. Good morning, Your Honors. My name is James Dirling appearing today on behalf of the appellants. Your Honors, imagine you go home today and you get a notice from the IRS saying that you owe a 15% tax on your consumption. This is a wholly new tax. The IRS proposes to tax both your income when you earn it and then your income when you spend it. You think this is illegal. You think the IRS has no legal basis to do that. And you go to court and you prove in court that the IRS in fact had no legal basis to do this. Five years after the fact, five years after the IRS takes this money from you, Congress passes a law saying, oh, the IRS retroactively had the authority to do this. Your Honor, in our view, that would be an unconstitutional exercise of congressional power and that's precisely what has happened in this case. We don't need to worry today about the ex post facto argument. We've resolved that adversely to you and Byer King, right? Your Honor, we will not focus on that issue today, but in our view, there is a remaining distinction that the court would need to take into account, an important factual distinction, which is unlike Wyer King, the period of retroactivity in this case is much longer. This is the oldest of the cases that arose afterwards. And so there is a factual distinction. But other than that factual distinction, Your Honor, we agree the argument this morning can focus on the substantive due process issues. Well, but that factual distinction, the only impact of that factual distinction is as it relates to your due process challenge, correct? It relates to both, Your Honors, because it relates to ex post facto because it is, one, it is relevant to factor number five under the Smith analysis. This court felt that Smith was the appropriate framework for evaluating this issue. In our view, the key factors in number five, and under those factors, the degree, the extent of the retroactivity is a relevant factor to consider. So it's relevant for ex post facto, but it is also relevant for the due process argument, Your Honor, because there are three fundamental reasons why this is an unconstitutional exercise of congressional power. Before you get to, can you just clarify a date question for me? Yes, Your Honor. What is the date of the earliest import that the countervailing duty, A, applies to under the order, first that question and then there's a closely related question. Your Honor, I don't know the precise day, but the first time that imports were subjected to countervailing duties, countervailing duty deposits were collected, cash was collected, was December 2007. December 17th? Yes. I believe that's correct, Your Honor, but it's the end of December 2007. Most of the cash was collected in 2008. Is there an issue about countervailing duties applicable to imports before that or is the deposit onset date the earliest? Your Honor, the way the countervailing duty law works is you can only collect duties for specific periods of time. That is the earliest period of time for which countervailing duties pursuant to this particular CBD order were collected. December 17th, 2007. Yes. Yes. That was the beginning of the period of investigation. That's when GPX started to have to pay attention. The reason I ask you, you won't be surprised to learn, is that it was October of 2007 that in the related proceeding, the government adopted its new policy reversing the policy from the 80s. Yes, Your Honor, but that goes to the question of what... It announced it a whole year before that, but it actually adopted it, I think it was in October. But, Your Honor, that goes to the question of what is in fact proper notice. And we think there are two important distinctions for the court to bear in mind. The first is this was not notice of Congress getting ready to change the law. This is notice of a government agency acting illegally. The government agency acting beyond the scope of its authority. And in our view, the illegal action of an agency acting beyond its power then, the power it had at that point in time, the improper exercise of the authority by the agency is a very different kind of notice is entitled to less weight. The other key distinction, Your Honor, is that whatever notice we might have had, that at some point in the future, Congress might change the law, that would not include notice that Congress would change the law with such an extreme period of retroactivity. Retroactivity under US law is disfavored, and there was no way we could reasonably foresee that Congress would not just change the law prospectively, but that Congress would change the law and impose a period of retroactivity of more than five years. Does it matter at all to you whether the initial decision, in this case, the one that Congress then displaced, was or was not a close question of statutory construction? Your Honor, in our view, it was not a close question because by that point in time, there was actually a very substantial legal basis for the finding of this court that Congress did not have the power at that time. Well, it seems to me that in addition to the question being one in which there were substantial arguments on both sides, our decision was not the final decision. We've held that for a long time. But the fact is that the government could also, instead of seeking legislation, have sought certiorari in the Supreme Court. And so unlike, for example, Carlton, where there was a change in the statute, here they were acting to resolve an issue which remained up in the air to the extent that the Supreme Court might have reviewed it, or I suppose we might have taken it in bank to review it. So that is a distinction of these cases where you are assuming that this was finally resolved. It wasn't finally resolved, that the government was wrong. Your Honor, with all due respect, we think the decision that the Commerce Department did not have the legal authority was finally resolved, sufficiently resolved for purposes of the argument we're making about the illegality. But you have to agree that the Supreme Court review was a distinct possibility, right? It was a distinct possibility, Your Honor, but when they did not pursue that opportunity, then it became final for purposes of our legal system. Yes, they could have appealed, and the Supreme Court possibly could have reached a different conclusion, but that did not happen. What did happen in your case, in this case, Your Honor, is we have the decision in GPX. This court was asked to reconsider that decision and to vacate it, and the court declined to do so. Instead, the court in the 2011 GPX decision affirmed and ratified the core legal reasoning of the 2011 GPX decision. So in our view, the combination of the reaffirmation of the core legal reasoning in 2012, the fact that the court expressly declined an opportunity to vacate the decision, the fact that there was no appeal to the Supreme Court, so there was no further guidance, in our system, this court has spoken and has rendered the final word about the meaning of the law. It's even accepting the proposition that this court spoke, that this court's decision is the final decision as to what the law was, and we accept the proposition that Commerce mistakenly was operating under the assumption that it had broader authority than it did. Isn't it a rational basis for retroactivity for Congress to correct the law once the court tells it that the agency didn't have the authority that Congress believes it had? It's not a rational basis, Your Honor, because the Supreme Court's jurisprudence on corrective, curative purpose for a rational basis draws a very clear distinction between correcting a mistake in the administration of the law and creating a wholly new liability. Let's suppose, for example, that this period of retroactivity were a year, the way it was with Carlin. You're saying that even under those circumstances, that would be a violation of due process? Well, Your Honor, that would be a different case in the following sense, that under the Supreme Court's guidance, the longer the period of retroactivity, the weaker the legal basis for the action. It's not a simple, if you have a basis for being retroactive, you can go back one year, two years, five years, ten years. There has to be some outer limit. Well, I understand that, but I'm asking you to assume, hypothetically, that we're dealing with a case in which there was a one-year period of retroactivity. There wouldn't, under those circumstances, be much of an argument that the legislation was unconstitutional. Your Honor, we would agree that a short period of retroactivity, say less than a year, which is the most common period because of the way the legislative process works, that would be a different and a much weaker argument for unconstitutionality. But that's why this case is very different because we're not talking about one year. Whatever point in time you believe the rights vested, whether it was in 2007 and 2008 when the government impermissibly took the money, or in 2009 when GPX had to waive its right to automatic liquidation under the statute to assert its legal rights, or in 2011 when the administrative review process was complete, there are three possible points, all of which predate the moment we're here now. The rights have vested. In our view, they vested long ago when the cash was impermissibly taken from GPX, and GPX has simply been trying to exercise its rights under the U.S. legal system to regain those funds that were improperly taken. Let's go back to your point where you said that the Court has always drawn a distinction between administrative, essentially administrative interpretations of the law and court interpretations of the law. But isn't Rahman the precise case in which the Court recognized that, in fact, it was a court's later determination that Congress may have found surprising, even if not erroneous, and that it was permissible for Congress to go back and correct the law to fill in the gap that the Court found to exist? Your Honor, whether it's a legislative mistake or a judicial interpretation, the distinction in the Supreme Court's jurisprudence seems to be the distinction between a correction in the administration of the law and the creation of a wholly new liability. In all of the cases we've read, Your Honor, the one that we think is factually most on point here is Justice Holmes' decision in Forbes' Pioneer Vote, which was commented on by the Supreme Court in Graham, where the Supreme Court basically focused on the clear principle that you cannot retroactively create new liabilities. And in our view, that is still good law. Unless the Court has any other immediate questions, I'd like to reserve the remaining three minutes for rebuttal. Okay. Thank you, Mr. Duren. Mr. Serdlov? Good morning. May it please the Court. This Court's decision in Wiring King puts to rest the X plus factor challenge. Wiring King is binding on this panel, and we believe that it's controlling on the retroactivity question. The only issue that remains, then, is the due process question. Well, how do you respond to your friend's argument on the other side, is that even if Wiring King does control on the retroactivity question, that as it relates to X plus factor, we were applying those factors, the Smith factors, to the facts before us, and that the facts here are at least different. Your Honor, I have two responses to that. The first is, I don't think that Wiring King is properly read that way. Wiring King discusses those factors, certainly as applied to the facts before it, but the language of Wiring King goes broader than that, and it discusses the reasonable basis for Section 1 of the Act and for the difference in effective dates between Section 1 and Section 2. I think, more importantly, there actually is not nearly as much of a factual distinction as GPX suggests there is. At most, the difference in terms of when duties were started to be collected was one or two years, and when we're dealing with a period of retroactivity of six years, that year-long period is not as much of a difference. It is not dispositive, and certainly not dispositive in light of the language from Wiring King that Congress had a rational basis that this Act was a curative measure and that it was rational for Congress to create different effective dates because, as the Court recognized, Section 2 was merely Congress acting to bring the United States into compliance with an inter-panel decision, and it was reasonable, the Court found, for Congress to only do the minimum necessary to bring the United States into compliance. Well, and there's no suggestion in the case that different companies would have a different challenge to the statute. I thought we made pretty clear the statute rose or fell as a single thing and not, you know, parse it out into individual applications. Yes, Your Honor. So it seems to me that the primary argument they're making is that five-and-a-half years is too long, and that the only case that sustained retroactivity of that long a period was Heinsman, which was seven years. So could you address that contention? Absolutely, Your Honor. I have a number of responses to that. One is that that whole argument assumes that there is actually a vested right, and for all the reasons that we've explained in our briefs, and that I'll be happy to elaborate, there is no vested right. Two is that Romaine, which we cite and which this Court pointed to, dealt with a period of retroactivity that was virtually the same as here, which was six years. And in that case, the Supreme Court did not find the period of retroactivity problematic, nor did it find a retroactive legislative action undoing an unexpected, or at least from the standpoint of Congress, unexpected judicial decision to be any sort of violation of the Due Process Clause. Does the timing at all impact the due process analysis, sort of in the abstract? I think the cases certainly suggest that it might. For example, this Court's decision in Edison dealt with a period that this Court described as severely retroactive, and the Court did apply a slightly different analysis. However, in that case, the Court was not dealing with, the Court did not characterize the statute as a tax. And it is important to draw a distinction between statutes that, in Edison, the Court characterized the statute as a form of exaction. And it is important to distinguish those types of statutes from the regime of taxation and from the regime of countervailing duties and anti-dumping duties, because this Court has made clear that there is no vested right in a particular rate of duty. There is no vested right to engage in commerce with the United States, to bring in products. And so all the arguments that a right vested for GPX have to fall in light of those binding precedents, and in particular NEC. Do process challenges ever be made post-liquidation? Yes, Your Honor. A circumstance that I can think of, for example, is if there was liquidation, final court decision, liquidation, and then Congress passes a law and Customs goes out and tries to collect duties for entries that have already been liquidated based on the law. That would be closer to an instance where rights had vested, because there actually was a final payment in that kind of sense. So even if there is not a right to a particular rate of duty, I think there could be an argument made that, having actually paid the final assessment, vested some sort of right. But if your argument is that there is no obligation to make the payment, then you really lose your ability to make a due process challenge under your theory. Because until you liquidate and make a payment, you can't raise it, and you can only raise it if you, in fact, make a payment and they want more. Yes, I think so, Your Honor. But I think that's a very important distinction. The fact that it is not automatic that every kind of legislation needs to create a right of action under the statute, what we're dealing with under the countervailing duty statute or the tax statute, the Supreme Court has made very clear that there actually is no vested right there. And so there is not a due process claim. Can I ask you first this same factual question I asked Mr. Ehrling? Is December 7th, December 7th, the date of the Supreme Court hearing? Yes, I believe so, Your Honor. Then a more broad doctrinal question. What modern Supreme Court case, or even an old Supreme Court case, if you want to talk to me about that, says that there is a threshold inquiry into something called a vested right, as opposed to using that language as a broad characterization of the proposition that you are not immune from legislative changes broadly for stuff you've already done? I have not found, but you've probably looked harder than I have, for a case that says there's a threshold inquiry into this thing you're calling vested right. Your Honor, I don't believe that the Supreme Court has characterized the inquiry as necessarily a threshold one. Or even defined it as an inquiry. All of the quotes you use simply assert the general proposition that you don't have an immunity from impositions of the legislature for stuff you've already done. That's as far as the language goes. And I understand that there is an important aspect of the rationality analysis that looks at the severity of the upsetting of expectations, but I don't understand what role in the analysis is played by some definitional inquiry of vesting or not, which for constitutional purposes, which has nothing to do with what may or may not be the case under a particular statutory regime like the liquidation scheme. Your Honor, I'm not aware of a Supreme Court case that sets up the analysis in that way. However, I am aware of this Court's decision in NEC Corporation, which we cited in our brief. And in that case, the fact pattern in that case is different. But in that case, this Court faced a due process challenge to... Substantive due process? Yes, Your Honor. It faced a general due process challenge to an anti-dumping duty investigation. And the Court first went and analyzed whether there's a right to substantive due process that plaintiff can rely on. And the Court rejected that proposition, saying, quote, engaging in foreign commerce is not a fundamental right protected by notions of substantive due process. That's sort of different from the vested rights inquiry. That's talking about the nature of the government interest in powers over foreign commerce. It's not talking about a completed transaction giving rise to a vested right, correct? Yes, that's correct, Your Honor. But we don't have a completed transaction here. And that's really what it comes down to, is that... I don't think anyone's suggesting that's not a relevant consideration. I think it's just sort of, it's not an on-off switch. It's a relevant consideration, but it's not determinative. What do you make out of the fact that in so many of these cases, that what we're dealing with is a statutory amendment to actually change the law, or changing a U.S. Supreme Court decision, or a state Supreme Court decision with respect to a matter of state law? That here, we had an issue which was still being litigated and presumably could have gone to the U.S. Supreme Court, or potentially re-hearing and back here. Your Honor, I think that question goes to the... I think that fact, that the case was still live at the time the legislation was passed, and that it had not, that the mandate in GPX-5 had not issued, defeats GPX's... That's a different question than I'm asking you. And that is, let's assume that the mandate had issued, that the case was over with here. We're an intermediate court. There's a possibility of going to the U.S. Supreme Court, or re-hearing and back. Does that give Congress greater power to step in and clarify the law than would exist if there'd been a final Supreme Court decision about it? Does that make a difference? Your Honor, I'm not sure I understand the question. It's the question whether it matters what, at what level of... The government has a choice. It could go for Supreme Court review, or it could go for legislation. That choice was faced here by the government. The government decided to go for legislation instead of further litigation. To what extent does that add to the government's interest in resolving a controversy which isn't completely final, because it's subject to potential Supreme Court review? I think it's an additional rational basis for the legislation. I think if the analysis gets to whether the legislation was arbitrary or rational, which is what GPX has to show in order to establish that the legislation violates the due process of the Constitution, then the court has to consider whether there is, in fact, a rational basis for the legislation or whether there's a potential rational basis for the legislation. Isn't that true regardless of whether they have a vested right? I mean, they still have to establish the rational basis, that there's no rational basis, correct? They still have to. Yes, Your Honor. So that your debate over vested rights or non-vested rights, while it is, as I said, perhaps a factor in the rationality, it's not determinative because the burden is to establish that Congress simply didn't have a rational basis for what they did. Your Honor, we believe that the vested right question is determinative based on NEC and based on the language of the Supreme Court. A case which doesn't use the term vested right, correct? It does not use that precise term, no, Your Honor. But even if the vested right question is not a threshold one and it's not dispositive, it does weigh on the analysis. And so let's assume retroactivity, let's assume even a vested right. The government simply has to have, the Congress simply has to have a rational basis for the retroactivity. That's right, Your Honor. Why don't you focus on that issue? Yes, Your Honor. Congress has to have a legitimate legislative purpose and that legitimate legislative purpose was already recognized in Wire King. Wire King held that the purpose of the act as a whole was a curative measure. It was meant to alleviate harm to the domestic industry caused by unfair trade practices. And the court held that remedying that harm fits within notions of how the countervailing duty law works generally and implicitly recognized that as a legitimate legislative purpose. The court's analysis certainly did not touch upon the Fifth Amendment question because that wasn't presented. But the language and the court's finding that it was reasonable for Congress to do what it did largely resolves that inquiry. Does it make a difference here that the dumping law is not concerned simply with the revenue for the government but protection of U.S. manufacturers and the equalization of competition so that perhaps there's a forward-looking effect with respect to the imposition of duties? Forward-looking impact? I'm not sure that it does make a difference, Your Honor. And the reason is because regardless of whether the revenue comes – whether the purpose is to – But it's not solely a revenue-raising measure, right? Absolutely not, Your Honor. And this court's decision in Wiarting certainly focused on the curative effect, the remedial effect of this legislation as part of the broader legislative scheme for anti-dumping and countervailing duties in remedying any harm, any potential harm to the domestic industry and the domestic manufacturers. And that's certainly – that is certainly a legitimate legislative basis. I would say that if we were dealing with a revenue-raising statute, Supreme Court cases would likewise support the notion that an imposition of a tax is a legitimate legislative basis. Any further questions? Okay. Thank you, Your Honor. Ms. Drake? Good morning. May it please the Court, Elizabeth Drake from Stewart & Stewart for Petitioners, Titan Tire, and the United Steelworkers Corporation. As Your Honor, Judge Dyke mentioned at the beginning of this argument, in Wiarting, the majority of this Court found that the 2012 Act was retroactive and affected a retroactive change in the law based on its conclusion that the GPX-1 decision was, quote, the statement of the law at the time the Act was enacted. We respectfully request that this Court revisit that aspect of the Wiarting determination in this case, either as a non-precedential statement of dicta or if binding and precedential in a hearing on Bonk before this Court. And there are three reasons that justify revisiting this determination. The first reason was described by Your Honor, Judge O'Malley, in the concurrence in Wiarting, and that's that the majority's conclusion conflicts with the conclusion in GPX-2, the second 2012, excuse me, GPX case where this Court held that prior to the enactment of the Act… Mm-hmm. …the merits of the retroactivity determination. If we're bound here by Wiarting, why would we revisit that question? Rule 35 states that the hearing on Bonk on a precedential issue may be merited if there's an inconsistency with a prior Court precedent. Here, we believe there's an inconsistency with the second GPX decision, as pointed out in Judge O'Malley's concurrence. We also believe there's an inconsistency with other circuit courts of appeals. We cite a number of circuit decisions, I believe, from seven different circuits that find that a later amendment can be clarifying in nature and thus not have an impermissible retroactive effect. But isn't that an issue you would have to raise in an en banc petition? I mean, this panel is bound, as you correctly point out, mine was a concurrence. There was a majority opinion that reached the conclusion. We're bound by that. Rule 35A of the Court, Your Honor, states that if the Court is going to overrule precedent, it can be made in a brief to the panel, and the panel will consider whether or not to request that the full Court consider the request for hearing en banc. There was no basis for the appellees in Wiarting to request a rehearing en banc because they prevailed on the merits that there was no violation found. So, procedurally, we believe this is the correct way to proceed to address this narrow aspect of Wiarting. Are you suggesting that if it is retroactive that you have a due process problem? No, Your Honor. We do not believe that there is either an ex post facto violation, as Wiarting found, or a due process violation. But we are raising this issue first because it can... Do you have some other reason for, other than this litigation, for caring about that? We care for the following reasons. First, this is a ground that we can raise on behalf of our client to dispose of all of the other issues and to prevail. We believe the due process arguments that we have are correct. But something outside of this case is motivating... Outside of this case, we believe that consistency among the Court's decisions and with other circuits is helpful in terms of predictability and consistency, and for future litigants, perhaps there would be a law that wouldn't pass the due process test. Does this have anything to do with the WTO? There was a WTO decision that looked at whether or not the law constituted a change or a clarification and looked at U.S. law to try to answer that question. At that point, Wiarting wasn't properly before the appellate body, and it couldn't reach that conclusion. But I don't think the WTO process should play any role in this Court's decision. I think that this Court should simply be concerned about consistency among its own decisions and consistency with other circuits. Okay. Thank you, Ms. Drake. Thank you. Mr. Gerlach? Thank you. First, on the issue of whether there's any need to reconsider Wiarting, we would just like to make two points. First, in our view, Wiarting was not internally inconsistent because the prior law did not require any adjustment for double-counting. It didn't require such an adjustment because it didn't allow any actions at all. There's no reason for the prior law to have addressed the issue of double-counting because the law didn't apply at all. And second, if you actually read the seven circuit court decisions cited in their brief, you will find that none of them address congressional efforts to tell a court how to interpret the law by overturning appellate court decisions. There really is not an inconsistency with the law of the other circuits. And more fundamentally, Your Honor, this is the Court that deals with the question of how to think about these issues in the context of the trade remedy laws, which are a unique statutory creature, and with all due respect, this Court's precedents are a much better framework for thinking about this issue than unrelated language and circuit court decisions that have never confronted this particular statutory framework. Does the imposition of anti-dumping duties have a forward-looking effect? Absolutely, Your Honor, and that's the other point that I wanted to close on. When thinking about the rational purpose here, we think it's very important to not focus on the rational purpose for the laws in general, but is there a rational purpose for the retroactivity? The panel posed that specific question. What is the forward-looking effect of the imposition of anti-dumping duties? Well, the forward-looking effect, Your Honor, that's to protect the domestic industry. The core rationale of these laws is to protect the domestic industry, and that's why prospectively there's no question. If Congress thinks that looking forward, the special anti-dumping regime for non-market economies isn't enough and there needs to be more protection, that's fine. Congress has clear legal authority to make that judgment and to impose additional protection. But retroactively, it makes no sense. Why? First, all of the competitive struggles, all of the protection has already been done. This is in the past. Retroactively, there's no benefit to the domestic industry. Retroactively, the effect is simply to target a narrow class of taxpayers, and in fact, it's not 24 CBD orders, Your Honor. Can I just ask you, I mean, why isn't there, in a general sense and perhaps the sense or a sense relevant to, say, ossuary against Turner Elkhorn, to say somebody was harmed at somebody, caused by somebody else. We now will hold the harmer responsible in a way that they weren't at the time. That has a kind of a traditional basis in our legal system and perhaps even has a forward-looking effect on helping to make the harmed person whole. Ossuary was a black lung case, is that right? Right. Your Honor, but the key difference between ossuary and cases in that line is this isn't a question of taking a situation where there is a harm that did not have a remedy and creating a remedy that may be looking backwards. This is a case where if there was a harm in the past, it was addressed with the anti-dumping measures. All of the parties involved in these litigations were subjected to parallel anti-dumping cases and the harm was fully remedied as the law contemplated that remedy at the time the harm took place. So, Congress had basically said, here is the remedy and it was imposed in every single one of these cases. Well, I guess the government wouldn't necessarily agree with you on that. Well, certainly there was a harm imposed through the anti-dumping. I don't think they can disagree with that because the anti-dumping measures were imposed. The question is whether that covers the full range of harm. In the law as it existed at the time, absolutely, Your Honor, and that's why we think the Supreme Court's precedence about creating a wholly new cause of action after the fact, creating a liability, a new liability, if the court is concerned with making sure that the harm was addressed, it was addressed. And Congress simply doesn't have the power to retroactively go back and create new liability to address a harm that has already been addressed. This isn't an area like Ussery and many other cases where there was a problem that did not have a solution in place and so Congress was retroactively trying to solve a past problem that didn't have a solution. In this case, there was a solution. It was in place. There was a legal framework for addressing this and Congress then went beyond that. Okay. Thank you, Mr. Earle. I thank all counsel. The case is submitted.